**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**V.**                                  **CASE NO. 5:25-CR-50041**

**DERRICK HILL**                                                          **DEFENDANT**

**OPINION AND ORDER**

Now before the Court is Defendant Derrick Hill's Motion to Suppress (Doc. 17). Hill challenges the constitutionality of the warrantless seizure of his person and search of his vehicle and personal belongings under the Fourth Amendment and seeks to suppress the physical evidence seized therefrom. Hill is charged with one count of possession of cocaine with intent to distribute based on cocaine that was found during the challenged search. Hill was previously indicted on the same charge in Case Number 24-50025 and filed a motion to suppress. The Court held a hearing on that motion on September 4, 2024, at which two of the officers involved testified. *See* Doc. 17-1, pp. 45–188 [hereinafter Hr'g Tr.]. That indictment was dismissed without prejudice on speedy trial grounds while the motion was pending. *See United States v. Hill*, Case No. 5:24-CR-50025 (W.D. Ark.), ECF 27. The Government reindicted Hill on April 16, 2025, on the same charge. Hill now renews his Motion to Suppress. The Court held a hearing on the Motion on June 5, 2025, at which the parties stipulated to the Court's receipt of the evidence and briefing from the prior motion. (Doc. 22). For the reasons that follow, the Motion to Suppress is **DENIED**.

1

## I.  FACTS

Hill was under police surveillance for suspected involvement in drug trafficking leading up to the March 28, 2024, encounter that is the subject of the instant Motion. On February 16, 2024, Detective Emilio Zacarias with the Fourth Judicial District Drug Task Force ("Task Force") obtained a search warrant for Hill's cell phone location data for the next 45 days. (Gov't Ex. 5). Prior to the warrant's issuance, Zacarias had received various tips about Hill. On January 12, he spoke with a confidential source ("CS") who told him that Hill was selling crack cocaine, cocaine, methamphetamine, and fentanyl using rental cars to travel to other cities or states to pick up and distribute the drugs. The CS also relayed Hill's cell phone number and vehicle information. (Hr'g Tr., pp. 11:12–12:7). Zacarias testified that the CS was reliable because they had previously provided information that resulted in arrests and convictions. *Id.* at pp. 12:19–13:4. At some point the CS also tried to arrange a controlled buy from Hill, but Hill informed the CS that he was no longer selling drugs. *Id.* at p. 12:8–18. The CS did not communicate with Hill after the warrant was issued. *Id.* at pp. 67:20–68:2.

On February 14, the concerned spouse of a cocaine addict contacted the Task Force tip line and spoke with Zacarias and another Task Force Detective, Dalton Frazier, to report that their spouse was buying cocaine from Hill. *Id.* at pp. 14:17–23, 48:10–17, 74:25–75:10. The spouse had discovered cocaine in their home, went through the addict's phone, and identified Hill as the addict's dealer. *Id.* at p. 43:10–23. According to Zacarias, the spouse provided Hill's phone number, information about his vehicles and where he was staying, and information about the quantity and cost of drugs purchased from Hill. *Id.* at p. 14:17–23. The two officers offered conflicting testimony as to whether or not the

spouse had also been present during drug transactions with Hill. *Id.* at pp. 43:10–23 (Zacarias), 75:1–23 (Frazier). Frazier, but not Zacarias, also testified that the Task Force was contacted by a friend of the same addict, who, Frazier reported, claimed they were present during drug buys from Hill. *Id.* at pp. 87:22–88:11.

The Task Force also received an anonymous tip after the warrant was issued. The tipster reported that Hill was staying at a Residence Inn and used two vehicles in his drug operation, a brown Chevy Impala and a blue Chevy Impala. Hill, according to the tipster, left the blue Impala parked at the hotel to store drugs and used the brown Impala to drive around. *Id.* at p. 15:1–14. The tipster also reported that Hill employed prostitutes in his operation to handle the narcotics. *Id.* Zacarias represented that the tipster communicated with the Task Force both before and up to possibly two weeks after the warrant issued. *Id.* at p. 69:6–23. Zacarias also testified that the tip line received other tips after the issuance of the warrant "saying pretty much what [he] already knew" around the time that Hill was staying at the Residence Inn in "roughly February to almost March." *Id.* at pp. 70:5–71:5.

An employee at a Residence Inn reached out to the FBI with concerns that Hill was bringing underage women to the hotel. Zacarias contacted the Residence Inn manager who gave Zacarias a room across from Hill's room to conduct surveillance, which was not fruitful. *Id.* at p. 47:10–19. The manager told police that Hill had a blue Impala at the hotel that he had refused to move when asked. *Id.* at p. 66:5–9. The conversation with the manager occurred in early March. *Id.* at pp. 70:24–71:5.

On March 22, the Friday before the March 28 search, Zacarias coordinated with Arkansas State Police to have Hill stopped for a traffic offense. *Id.* at p. 20:6–22. Hill

consented to a search of the brown Impala he was driving, but police were not able to open and search the trunk, and Hill told them it did not work. *Id.* at pp. 20:23–21:3. They did not find any drugs in the portions of the vehicle that they were able to search. *Id.* at p. 21:10–13.

On March 28, Hill was staying at a Days Inn in Fayetteville. *Id.* at pp. 21:22–22:4, 76:10–17. Frazier and Detective John Billingsley were surveilling the Days Inn on an unrelated case and notified Zacarias that Hill was there. *Id.* at p. 51:9–14. Sometime shortly before 10 AM, Frazier witnessed Hill and a woman, Taneasia Johnnie, leave a second-floor room and each take some things to their cars, Johnnie's Nissan Versa and Hill's brown Impala, which were parked next to each other. *Id.* at pp. 76:22–77:8. Hill was able to open the trunk of the brown Impala that he had told police days earlier was inoperable. *Id.* at pp. 78:21–79:9. Frazier saw Hill carry a multi-colored backpack down to the cars. *Id.* at pp. 77:15–16, 79:10–11. Johnnie then drove Hill's Impala the short distance to the breezeway next to the motel lobby while Hill walked over to the lobby.

In the meantime, Zacarias and Detective Juan Hernandez had arrived at the Days Inn and saw Hill walking to the lobby. *Id.* at pp. 51:23–52:3. Zacarias approached Hill in the lobby, and Hernandez joined him a few minutes later. *Id.* at pp. 54:21–55:1. All the Task Force officers on the scene were in plain clothes, so Zacarias identified himself as law enforcement and told Hill that he was under investigation. *Id.* at pp. 24:15–25:77. Zacarias "gave [Hill] details" about the investigation, including "everything that [Zacarias] knew about him, everything he [Hill] did, what kind of vehicle he [Hill] drove," before asking for consent to search Hill's vehicle, which Hill granted. *Id.* at pp. 25:2–7, 53:11–23.

Zacarias, Frazier, and Billingsley began searching the Impala while Hernandez stayed with Hill. *Id.* at pp. 26:23–27:10, 58:15–17.

While Zacarias approached Hill in the lobby, Frazier had simultaneously approached Johnnie in the Impala outside the lobby and told her to get out. *Id.* at p. 79:19–23. Billingsley was outside with Frazier initially but did not approach Johnnie. *Id.* at p. 89:12–17. Frazier asked Johnnie about the Nissan and whether there were drugs, guns, or cash in the car. *Id.* at pp. 81:23–82:1. Johnnie told him there was nothing in the car, but that she sometimes gave people rides and it was possible someone left something in the car. *Id.* at p. 82:1–11. Frazier asked for the names of anyone who might have left something in her car, and Johnnie told him she could not name anyone in particular. *Id.* at p. 82:7–11. Frazier then asked for and received her consent to search the car. *Id.* at p. 82:13–14.

A patrol officer, Bobby Vachong, showed up at the Days Inn shortly after detectives began searching Hill's Impala, and most of the rest of the interaction is recorded on his body-worn camera. *Id.* at p. 26:6–15; Gov't Ex. 2. The body-cam footage shows that Hill was standing up and appeared to be walking toward the lobby exit when the patrol officer entered the motel. (Gov't Ex. 2, 00:31). Hernandez, who was in the lobby with Hill, told Hill, "Yo, have a seat," before Hill reached the lobby door; Hill complied and sat down in the chair in front of Hernandez facing away from the breezeway where his car was being searched. *Id.* at 00:37. Zacarias and Frazier continued their search of Hill's Impala—one of them is visible on body cam through the window searching the front seat. Several minutes later, they opened the trunk and found a scale which tested positive for cocaine residue. (Hr'g Tr., pp. 26:16–27:20). After the positive residue test, Zacarias gave Hill his

*Miranda* warnings and asked him about the scale. (Gov't's Ex. 2, 05:40). Hill denied that there was a scale in his car, accused the officers who pulled him over on the previous Friday of planting it, and told Zacarias, "If I thought I had anything, I wouldn't have even gave consent, I would have made you go and get a search warrant." *Id.* at 06:40, 09:00. At Zacarias's direction, Vachong searched Hill, handcuffed him, and put him in the back of a police car. *Id.* at 10:00, 14:05, 15:40.

Midway through the search of the Impala, Frazier, having obtained Johnnie's consent, went to search the Nissan. The Nissan was locked, and Johnnie pointed Frazier to the keys, which were in her makeup bag in the back seat of the Impala. (Hr'g Tr., p. 95:14–23). He did not recall whether the scale from the Impala had been found and tested before he went to search the Nissan. *Id.* at pp. 91:25–92:4. He unlocked the Nissan and went directly for the multi-colored backpack he had watched Hill carry downstairs. *Id.* at p. 83:5–10. The backpack had "Hill" written on the front in black marker, but Frazier testified that he did not see it before searching the backpack. *Id.* at pp. 94:23–95:2; Gov't's Ex. 1. The backpack was zipped but not locked. (Hr'g Tr., p. 83:12–15). Frazier unzipped it and found a pair of 4XL men's sweatpants; in the pocket of those pants, he found the cocaine, which weighed in at 26.37 grams. *Id.* at p. 85:6–17. Frazier testified that he did not notice the size of the pants until after the cocaine was located. *Id.* at 84:4–8. He continued to search the backpack and also found fentanyl patches, benzocaine, a digital scale, plastic baggies, and mail and prescription drugs bearing Hill's name. *Id.* at pp. 83:8–15, 85:3–23. Frazier testified that he looked in the sweatpants first, and the mail and prescription drugs "would have been likely found after" the illicit drugs. *Id.* at pp. 85:19–86:4, 83:8–25.

## II.  DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. "If evidence was gathered in violation of the Fourth Amendment, it may be suppressed under the exclusionary rule." *United States v. Eggerson*, 999 F.3d 1121, 1124 (8th Cir. 2021) (citing *United States v. Leon*, 468 U.S. 897, 906 (1984)). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (alteration in original) (internal quotations omitted) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). "While the 'ultimate touchstone' of any Fourth Amendment analysis is 'reasonableness,' the Supreme Court has long held that a warrant is required for all searches and seizures, unless an exception to the warrant-requirement applies." *United States v. Keck*, 2 F.4th 1085, 1088–89 (8th Cir. 2021) (citation omitted).

It is uncontested that the police did not have a warrant to seize Hill or to search his person, vehicle, or personal effects. Hill argues that the events leading up to the search of his backpack and the search itself were unconstitutional, either in themselves or as fruit of the poisonous tree of earlier events. The Court addresses each potential search or seizure event chronologically.

### A.  Lobby Encounter

Hill first argues that he was unconstitutionally seized when Zacarias approached him in the lobby of the Days Inn. The government argues that it was a consensual

encounter, not a seizure, but if it was a seizure, it was a lawful *Terry* stop. A seizure implicates the Fourth Amendment and its protections, while a consensual encounter with law enforcement does not. *United States v. Grant*, 696 F.3d 780, 784 (8th Cir. 2012). Because the Court finds that even if Hill was seized, the seizure was a permissible *Terry* stop, the Court need not determine whether Hill was, in fact, seized.

One exception to the warrant requirement for seizures is the so-called *Terry* stop. A police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop," *United States v. Collins*, 883 F.3d 1029, 1031–32 (8th Cir. 2018), if they reasonably suspect that "criminal activity may be afoot," *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968). Officers must have a "'particularized and objective basis' for suspecting legal wrongdoing," that is, reasonable suspicion must be founded on more than a "mere 'hunch.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (first quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981); and then quoting *Terry*, 392 U.S. at 27).

"Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007). "The statements of a reliable confidential informant are themselves sufficient to support probable cause" and therefore also clear the lower reasonable suspicion bar. *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998); *see United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008) ("Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information."). "Whether an anonymous tip suffices to give rise to reasonable suspicion depends on both the quantity of information it conveys as well as the quality, or degree of reliability, of that information, viewed under the totality of

the circumstances." *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001). "[A] primary determinant of a tipster's reliability is the basis of his knowledge." *Id.* at 734.

Here, the Government relies on both known informants, unproven informants, and anonymous tipsters to support reasonable suspicion. The Court finds that Zacarias's testimony that the CS had previously provided information that resulted in arrests and convictions establishes the CS as a reliable confidential informant whose information alone is sufficient to establish reasonable suspicion. But the CS is not alone: Officers also relied on information from at least one other known, if unproven, informant (the Residence Inn manager) and at least one anonymous tipster (the concerned spouse of a cocaine addict). And even that anonymous tipster's information is supported by sufficient indicia of reliability because the tipster provided a strong basis for their knowledge: The concerned spouse found drugs at their house, went through the addict's phone, and identified Hill as the addict's source. (Hr'g Tr., p. 43:10–23).

Hill argues that the Government cannot rely on the CS because their information was stale: The CS provided information in January and thereafter failed to conduct a controlled buy because Hill said he had stopped selling. Police continued to surveil Hill unsuccessfully for over two months before the encounter on March 28. Information underlying police suspicion is considered stale if it "is not sufficiently close in time" to the search or seizure for reasonable suspicion to exist at the time of the search or seizure. *United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017); *see United States v. Lopez-Tubac*, 943 F.3d 1156, 1160 (8th Cir. 2019) (applying standard for staleness from warrant context to *Terry* stop). There is "no fixed formula for deciding when information has become stale, but [courts] consider the nature of the crime being investigated and the

property to be searched." *United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017) (citation and internal quotation marks omitted). "In investigations of ongoing narcotic operations, intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale." *Id.* (alteration in original) (citation modified).

Here, the lapse in time after the initial CS tip may have been over two months, but the Task Force continued to receive information corroborating the initial tip until early March. "When recent information corroborates otherwise stale information, [reasonable suspicion] may be found." *United States v. Kattaria*, 553 F.3d 1171, 1176 (8th Cir. 2009). Moreover, a 2.5-month span between a tip and a search is within the permissible range of time to support the higher probable cause requirement for a warrant, and as such also supports reasonable suspicion. *United States v. Schaefer*, 64 F.4th 1004, 1009 (8th Cir. 2023) (CS's information from 2.5 months before searches was not stale when law enforcement continued to investigate the defendant and "nothing during the investigation diminished [the officer's] suspicion that [the defendant] was engaged in illegal conduct").

Hill's statement to the CS that he was no longer selling may have dispelled suspicion for a time, but the subsequent tips tend to revive that suspicion. Finally, the nature of the crime—drug possession with intent to distribute—indicates, under Eighth Circuit precedent, that this information has a long shelf life. While either stale information or anonymous tips alone may be insufficient to establish reasonable suspicion, the multiple tips here tend to corroborate each other and, taken together, are sufficient to establish reasonable suspicion. Therefore, the investigatory stop of Hill in the Days Inn lobby was a reasonable seizure permissible under the Fourth Amendment.

**B.  Impala Search**

Generally, a search conducted with consent does not require a warrant or even probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Hill argues that the search of his Impala is fruit of the poisonous tree, and that his consent to the search did not purge the taint of the illegal detention in the hotel lobby. Because the Court concludes that the police interaction in the hotel lobby was not unlawful, Hill's initial consent to the search was not tainted.

Hill also argues that he was seized and implies that the search became non-consensual when Hernandez told Hill to "have a seat" facing away from his vehicle as Hill was walking toward the lobby doors while the search of his Impala was underway. "Once given, consent to search may be withdrawn: Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement." *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) (citation modified). "If equivocal, a defendant's attempt to withdraw consent is ineffective and police may reasonably continue their search pursuant to the initial grant of authority." *Id.* "[C]onduct withdrawing consent must be an act clearly inconsistent with the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both." *Id.* (alteration in original) (quoting *Burton v. United States*, 657 A.2d 741, 746–47 (D.C. App. 1994)).

Here, the Court concludes that Hill walking toward the door, complying when told to sit down, and sitting silently for several minutes while the search continued was not clearly inconsistent with his consent to search and did not constitute an unequivocal withdrawal of consent. This appears to be consistent with Hill's interpretations of his

actions as well: After officers discovered the scale in his trunk, he remarked, "If I thought I had anything, I wouldn't have even gave consent, I would have made you go and get a search warrant." (Gov't's Ex. 2, 09:00). Hill validly consented to the search and did not withdraw his consent, so the search of his Impala was lawful.

### C.  Nissan Search

Hill argues that Johnnie was also unlawfully seized and her consent to the search of the Nissan was therefore invalid. He asserts that, as the owner and passenger of the Impala that Johnnie was driving, he has standing to contest her unlawful seizure. "The Fourth Amendment protects the people against unreasonable searches of 'their' effects, and an accused in a criminal case may not assert the Fourth Amendment rights of a third party." *United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014). Hill was not a passenger in the Impala at the time Johnnie was approached, and a defendant does not have standing to complain of a police seizure of someone else's person. *See United States v. Rodrequez*, 859 F.2d 1321, 1325 (8th Cir. 1988) ("Madrazo obviously had no standing to complain of the officers' search of Bennett."). Therefore, the Court does not examine whether Johnnie validly consented to the search of her Nissan.

### D.  Backpack Search

Hill also argues that Johnnie's consent to search the Nissan did not extend to Hill's backpack within the Nissan. The Court assumes that Hill has standing to make this challenge. *See Bond v. United States*, 529 U.S. 334, 336–38 (2000) (holding that a bus passenger had a reasonable expectation of privacy in his personal luggage which was placed in the luggage rack).

"By obtaining [Johnnie]'s consent to search the car, the officer also obtained consent to search a closed container in that car, provided that it was objectively reasonable for the officer to believe that [Johnnie]'s consent extended that far and that the closed container might be concealing drugs." *United States v. Hammons*, 152 F.3d 1025, 1027 (8th Cir. 1998). Hill argues that it was not objectively reasonable for Frazier to believe that Johnnie's consent extended to the backpack because Frazier had watched Hill, not Johnnie, put the backpack in the car, Johnnie had informed Frazier that some of the stuff in the Nissan was not hers, the backpack had "Hill" written in Sharpie on the front, and the backpack contained clothes that were too large to be Johnnie's and mail and prescriptions bearing Hill's name.

The Government argues that it was reasonable for Frazier to believe that Johnnie had authority over the backpack and that her consent therefore extended to the backpack. Frazier saw both Hill and Johnnie carrying items down and putting things in both cars, so, the Government argues, it was not clear that the backpack was Hill's just because he was carrying it. Johnnie had control over the Nissan: It was locked, and the keys were in Johnnie's makeup bag. And while Johnnie told Frazier that other people might have left things in her car, she did not identify Hill as such a person when asked to name names. The word "Hill" written on the front of the backpack is not nearly as conspicuous as he makes it out to be; while the word "Hill" is discernible, the black Sharpie is faint and does not stand out on top of the graphic black and neon print. (Gov't Ex. 1). Finally, Frazier testified that he probably did not see the mail, prescription bottles, or the size of the sweatpants until after he located the cocaine.

"'Common authority' is determined by mutual use, joint access, and control, and is a question of fact." *United States v. Munoz*, 590 F.3d 916, 922 (8th Cir. 2010) (citation modified). This is a close case, but on balance the Court agrees with the Government that Frazier could have reasonably believed that Johnnie had common authority over the backpack. At the time of her consent, Johnnie had access to and control over the backpack—it was locked in her car, and she had the keys. Hill had placed it in her car but was not at any point a passenger in the Nissan.

Moreover, "[i]t is reasonable for police officers to form their impressions from context, and the Fourth Amendment does not require police to go behind appearances to verify third party authority." *United States v. Hayes*, 75 F.4th 925, 927–28 (8th Cir. 2023) (citation modified). Here, Hill and Johnnie both appeared to be putting items into each other's cars around checkout time while leaving a hotel room. A reasonable officer could conclude that the backpack was Johnnie's and Hill was just carrying it to her car. While Frazier could have taken more pains to investigate the backpack's ownership before searching it, considering that Johnnie did not identify Hill as someone who may have left things in her car when given the opportunity, the law does not require Frazier to take such pains as Johnnie plainly had access to and control of the backpack.

Finally, the backpack was plainly large enough to conceal drugs, and the officers had received tips indicating that Hill would use women and a second car to stash drugs outside his own possession. It was reasonable for Frazier to believe that Johnnie's consent extended to the backpack and that drugs could have been concealed in the backpack at the time he began the search and located the cocaine. As such, the search

14

of the backpack did not violate the Fourth Amendment, and the Court will not suppress the evidence found therein.

### III. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion to Suppress (Doc. 17) is **DENIED**.

**IT IS SO ORDERED** on this 27th day of June, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE